FILED

2014 Jan-08  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **JOHN RILEY and GENEVIEVE HARRIS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.: 2:12-CV-346-VEH** |
| ) | |
| **UNIVERSITY OF ALABAMA HEALTH SERVICES FOUNDATION, P.C.,** ) | |
| ) | |
| **Defendant.** ) | |

---

## **MEMORANDUM OPINION**

This employment discrimination action was filed on February 1, 2012, by the plaintiffs, John Riley and Genevieve Harris, against the University of Alabama Health Services Foundation, P.C. ("UAHSF").[1]  As against UAHSF, Count One of the complaint alleges race discrimination in violation of: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); 42 U.S.C. § 1981, and 42 U.S.C. § 1983.  Count Two alleges race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Finally, Count Three alleges retaliation in violation of Title VII, 42 U.S.C.

---

[1]The complaint also asserted claims against Demonsthenes Lalisan.  Lalisan was dismissed from this action on January 29, 2013.  (Doc. 17).

§ 1981, and 42 U.S.C. § 1983.

On March 1, 2013, the defendant filed its motion for summary judgment. (Doc. 19). In support of its motion, the defendant submitted, among other evidence, the affidavit of Demosthenes Lalisan. (Doc. 20-20). The plaintiff responded to the motion for summary judgment on March 29, 2013. (Doc. 23). In support of its response, the plaintiff submitted the declarations of John Riley, Genevieve Harris, and Joe Captain. (Docs. 24-1, 24-2, 26-5). On April 12, 2013, the defendant moved to strike portions of the declarations of John Riley, Genevieve Harris, and Joe Captain. (Doc. 29). On May 17, 2013, the plaintiffs moved to strike portions of the affidavit of Demosthenes Lalisan. (Doc. 33). On December 19, 2013, the court held a hearing on the motions. All three motions are now under submission and before the court for disposition.

For the reasons stated herein, the motions to strike will be **GRANTED in part** and **DENIED in part** as noted herein. In addition, the motion for summary judgment will be **GRANTED** as to the section 1983 and retaliation claims, and **DENIED** in all other respects.

## I.   APPLICABLE STANDARDS

### A.   MOTIONS TO STRIKE

It has long been the law in this circuit that, when deciding a motion for

summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence.  In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2).  Although the defendant has styled the Motion as a motion to strike, the Motion is, in substance, a challenge to the admissibility of the plaintiffs' evidence.  Therefore, the court will treat the Motion as an objection under Rule 56(c)(2).

### B.    MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation

marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether

that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116.  In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this

position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.    THE DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE DECLARATIONS OF JOHN RILEY, GENEVIEVE HARRIS, AND JOE CAPTAIN (DOC. 29)

The defendant challenges the admissibility of the evidence the plaintiffs have submitted in opposition to the motion for summary judgment.  Of course, evidence submitted in support of, or in opposition to, a motion for summary judgment does not have to be admissible under the Federal Rules of Evidence, as long as it could be reduced to an admissible form at trial.  *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) *aff'd sub nom. McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997)("We read this statement as simply allowing *otherwise admissible* evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form.").  Still, "an objection [under Rule 56(c)(2)] functions much as an objection at trial . . . . *The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated*."  FED. R. CIV. P. 56 advisory

committee's note to 2010 amendments (emphasis added).

A.     **Declaration of John Riley (Doc. 24-1)**[2]

1.     ***"Joe Captain's job description was changed in an obvious effort to disqualify Genevieve and I. The education requirements were also changed in order to justify giving the job to Montgomery, who was only a high school graduate." (Doc. 24-1 at 6).***

The defendant argues that this section of the affidavit is "[s]peculation, lay witness opinion evidence[,] and not based on personal knowledge." (Doc. 29 at 2).

Rule 56(c)(4) provides

An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c)(4).  Further, a lay witness may only offer an opinion if it is: "rationally based on the witness's perception." FED. R. EVID. 701.

"Rule 701's requirement that the opinion be 'rationally based on the perception of the witness' demands more than that the witness have perceived something firsthand; rather, it requires that the witness's perception provide a truly rational basis for his or her opinion." *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1201 (3d Cir.1995). "The nature and extent of the contacts and the observations of the witness should be as detailed as possible, but it must be recognized that an adequate foundation for opinion testimony by a layman is established when the testimony discloses that the witness through contacts with the subject had a reasonable opportunity to form

---

[2]In addressing these motions the court will set out, as separate subheadings, the evidence that is at issue, and analyze the arguments regarding same.

an opinion." *United States v. Pickett,* 470 F.2d 1255, 1258 (D.C.Cir.1972).

An opinion is admissible only if the court determines that an adequate foundation has been established. *See* 29 Wright & Gold, *supra,* § 6254 at 145 (collecting cases). The district court determines, under Rule 104(b), whether an adequate foundation has been established to support a finding of rational perception. The court also determines, under Rule 104(a), whether the proffered opinion is based on personal knowledge and will be helpful to the jury. *See United States v. Rea,* 958 F.2d 1206, 1216-17 (11th Cir.1992) (discussing FED. R. EVID. 104).

*KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1273-74 (M.D. Ala. 2001).  A party's mere "belief" and/or speculation is not based on personal knowledge and is not competent summary judgment evidence.  *Gen. Longshore Workers, Int'l Longshoremen Ass'n, Local 1988 v. Pate Stevedore Co.*, No. 91-30292-RV, 1993 WL 603297 at *8 (N.D. Fla. Dec. 30, 1993) *aff'd sub nom. Gen. Longshore v. Pate Stevedore*, 41 F.3d 668 (11th Cir. 1994) (holding that a party's belief does not satisfy the personal knowledge requirement because "[b]elief, no matter how sincere, is not equivalent to knowledge") (*citing Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949)).

The affidavit does not show how Riley is competent to say either that the changes[3] were "an obvious effort to disqualify Genevieve and I," or that they were

---

[3]As will be shown in more detail in the ruling on the motion for summary judgment, when Captain left his position, another employee was given his responsibilities, and a new position was created.  Part of the responsibilities of the new position were the same as those in

done "in order to justify giving the job to Montgomery, who was only a high school graduate." It also does not specify by whom this "effort" was made. These statements are pure speculation.

The plaintiffs argue that the paragraph should be allowed because these statements "are Riley's belief based on his own personal experience and knowledge of the relevant circumstances." (Doc. 43 at 7).[4] The court is not persuaded. According to FED.R.EVID. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." For a matter to be considered within a witness's personal knowledge, it must be "derived from the exercise of his own senses, not from the reports of others—in other words, [it] must be founded on personal observation" *U.S. v. Evans,* 484 F.2d 1178, 1181 (2nd Cir.1973) (quoting 2 Wigmore, Evidence, 3d ed. 1940, § 657); *see, e.g., United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995) (no error in a murder-for-hire prosecution to permit a 911 operator and a paramedic to testify that the defendant had feigned agitation and grief over finding his wife's body, because both witnesses had ample opportunity to assess his behavior and were better able than

---

Captain's former position, with some additional responsibilities added. In addition, the educational requirements of the new position were not as stringent as in Captain's old position.

[4]Indeed, the plaintiffs, in their "general responses," argue that it is enough that "[e]ach of the challenged declarations is preceded by the statement that the content is based on the declarant's personal knowledge." (Doc. 43 at 4) (emphasis in original); see also doc. 43 at 5.

the jury to determine whether it appeared abnormal under the circumstances). The statements that the changes were "an obvious effort to disqualify Genevieve and I," and that they were done "in order to justify giving the job to Montgomery, who was only a high school graduate," will be **STRICKEN**.   In all other respects, the paragraph will be considered.

> **2.**   ***"Since Montgomery has been in the manager position, UNOS gave us a warning for having ongoing UNOS violations by our organ procurement personnel. They recommended doing root cause analysis. They found our excuses unacceptable." (Doc. 24-1 at 9).***

The defendant argues that this statement is "hearsay, speculation, and lay opinion testimony."  (Doc. 29 at 3).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c).   "Hearsay is inadmissible unless the statement is not hearsay as provided by Rule 801(d), or falls into one of the hearsay exceptions enumerated in Rules 803, 804, and 807."  *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005).

> The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, *amended in part on rehearing,* 102 F.3d 1118 (11th Cir.1996), *cert. denied,* 520 U.S. 1274,

117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). An affidavit submitted in connection with a motion for summary judgment may contain hearsay statements that would be admissible at the trial under exceptions to the hearsay rule. *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2nd Cir.1991).

*Wyant v. Burlington N. Santa Fe R.R.*, 210 F. Supp. 2d 1263, 1275-76 (N.D. Ala. 2002) (Ott, J.).

The plaintiffs argue that the statement is not hearsay because it is not offered to prove the truth of the matter asserted, but to show that the defendant's proffered reason for hiring Montgomery into the new position was pretext.

In its reply brief to the motion for summary judgment, the defendant states:

UAHSF's reasons for selecting Montgomery are undisputed—after interviewing the candidates, Meeks and Lalisan thought he was the best candidate. Specifically, Meeks felt Montgomery demonstrated in the interview the most comprehensive understanding of the QA/QI process of all the candidates. Given the fact that the AOC's AOPO accreditation depended on its successful incorporation of QI functions, it was important to select a candidate who understood the role of QI component of the QA/QI Manager position. In this case, Lalisan thought Montgomery's responses during the interview demonstrated an understanding of the quality improvement process and of the AOC organization as a whole. Ultimately, they chose Montgomery because of his breadth of knowledge of AOC operations, his track record in the AOC, and his performance in the interview.

Although Plaintiffs brought skills and ideas to the table, ultimately the decision makers felt Montgomery brought more.

(Doc. 21 at 24-25). It is unclear how Montgomery's performance <u>after</u> he was placed

11

into the position is evidence that the defendant's above reasons for placing him <u>into</u> the position in the first place is pretextual.  Nothing about the statement in the affidavit, which vaguely discusses a "warning" for "violations," without more specifics, establishes pretext.

Even if the warning <u>were</u> admissible to show pretext, the actual warning itself should have been produced.  The plaintiff has failed to show how <u>his statement as to the contents of the warning</u>, which is clearly offered to prove the truth of the matter asserted (that a warning was issued) is admissible.   The statement will be **STRICKEN**.

> **3.** ***"The AOPO found all departments lacking, so they made recommendations for each department to develop processes to deal with complaints and errors before the AOC can obtain AOPO certification. Montgomery lacks the expertise to implement such a program." (Doc. 24-1 at 9).***

The defendant argues that the first sentence is hearsay.  (Doc. 29 at 3).  In response, the plaintiffs only refer to their response to the hearsay argument regarding the previous statement.  This statement will be **STRICKEN** for the same reason as the previous statement.

The defendant argues that the second sentence is speculation and an impermissible opinion of a lay witness.   "An opinion is admissible only if the court determines that an adequate foundation has been established." *KW Plastics*, 131 F.

Supp. 2d at 1273-74.  The plaintiffs respond to this argument only by saying that his opinion "is based on his own personal perception and knowledge of Montgomery's lack of experience, qualifications and skill to perform the job." (Doc. 43 at 10).  They point to no portion of the declaration which establishes the foundation for this opinion.  They neither cite nor discuss Rule 701 of the Federal Rules of Evidence <u>as it applies to this statement in particular</u>.[5]  The plaintiffs have failed to carry their burden of showing that this statement is admissible.  It will be **STRICKEN**.

4.  *"Thus, the FDA recognized that Walt Montgomery did not possess the training or education, coming from the IT department, to perform the core responsibilities for his position." (Doc. 24-1 at 11).*

This statement is the last sentence of paragraph 33 of Riley's affidavit.  It is Riley's conclusion based upon the contents of a July 22, 2011, letter the defendant received from the Food and Drug Administration.   The defendant objects to the statement as "speculation and lay opinion testimony." (Doc. 29 at 3).  The plaintiffs state that the statement is not speculation because "Riley has stated the findings of the FDA." (Doc. 43 at 10).  They also state that this is not Riley's opinion but instead are "opinions of the FDA." (Doc. 43 at 11).

---

[5]It is insufficient for the plaintiffs to include a "general" discussion of Rule 701 at the beginning of the brief, and then, as they have done repeatedly, incorporate that discussion by reference.  <u>As to each statement which is attacked</u>, the plaintiffs must show <u>how</u> the requirements of Rule 701 are satisfied.

Riley's statement is either his impermissible lay opinion as to what the letter means, or it is a hearsay statement of the contents of the letter.  Either way, it is inadmissible.  The letter should speak for itself.   The statement will be **STRICKEN**.

> **5.** ***"The procurement team did not know that a new form was created to help them document the usage of instrument trays during procurement. The first thing the auditor looks for is proof that the OPO has executed the corrective actions." (Doc. 24-1 at 11).***

The defendant argues that this is "[h]earsay, speculation, and lay opinion testimony." (Doc. 29 at 3).

The first sentence is speculation.  The declaration lays no foundation for how Riley would have personal knowledge about what the procurement team would or would not know.  The plaintiffs argue that "[t]he statements are based on Riley's personal knowledge that the existence of the form had not been passed on to the procurement team by Montgomery, because the procurement team members did not use the form in their day-to-day activities."  (Doc. 43 at 12 (citing doc. 20-1 at 40-41)).  The record citation they give is to a section of Riley's deposition, which does not discuss the form at all.

The first sentence will be **STRICKEN**.  Although the defendant seeks to strike the remainder of this statement, it offers no basis for doing so.  The remainder of the statement will be considered.

6.    *"Montgomery's lack of QA experience has resulted in problems with the FDA."  (Doc. 24-1 at 12).*

The defendant argues that this statement is "[s]peculation and lay opinion testimony." (Doc. 29 at 4).  The plaintiff insists that Riley has first hand knowledge of the problems created by Montgomery.  If that is so, statements regarding the <u>specific</u> problems Riley has knowledge of might be admissible, but this conclusory statement will be **STRICKEN**.  *See Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135, 139 (5th Cir.1973)[6]; *see also Johnson v. Scotty's, Inc.,* 119 F.Supp.2d 1276, 1281 (M.D.Fla.2000) ("[a]n affidavit must be stricken if it is a conclusory argument rather than a statement of fact[.]").

7.    *"Lalisan and Hicks had given the position to Montgomery before they interviewed me. Montgomery did not do a good job supervising other employees as data manager."  (Doc. 24-1 at 13).*

The defendant argues that this statement is "speculation and lay opinion testimony," and that Riley "lack[s] personal knowledge" to make this statement.  It is undisputed that, on November 8, 2010, Lalisan and Hicks told Riley that "Montgomery was being placed in the QA Manager's position."  (Doc. 24-1 at 6). Of course, the defendant states that this was done on an interim basis, and that the

---

[6]The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

actual position for which the plaintiffs applied was a <u>new</u> position.  No foundation has been laid to explain how Riley could have personal knowledge as to whether Montgomery was given the new position before the plaintiffs were interviewed. Riley is going beyond recounting facts within his personal knowledge, and is merely telling the finder of fact what conclusion to reach.  As such it is a "meaningless assertion[] which amount[s] to little more than choosing up sides." Fed. R. Evid. 701 (advisory committee notes).

The second sentence is Riley's conclusory opinion.  The plaintiffs argue that this "was common at the AOC of which Riley was aware." (Doc. 43 at 14) (citing 20-2 at 2(179) (Riley deposition)).  The cited section of Riley's deposition does not lay a foundation to explain how Riley could make such a statement.  In the cited portion of his deposition, Riley only makes the additional conclusory statements that Montgomery was "reliant on his staff to guide him through management," and he "has to be taught quality assurance." (Doc. 20-2 at 2(179)).

These statements will be **STRICKEN**.

### B.    Declaration of Genevieve Harris (Doc. 24-2)

> 1.    *"In November 2010, Walt Montgomery (white) was promoted to QA Manager, after the departure of Joe Captain, the previous manager. According to Linda Sojourner, the AOC did not post the position before announcing the promotion of Walt Montgomery." (Doc. 24-2 at 3-4).*

16

The defendant objects to the second sentence as hearsay, to which the plaintiff responds:

> Linda Sojourner is Meeks'[s] Administrative Assistant with responsibility for job posting and in management at the AOC. (Doc. 20-7, p. 23; Doc. 20-4, p. 108; Doc. 24-3, p. 54:23; Doc. 20-7, pp. 23:23-24:2). As such, Sojourner is an agent of the Defendant. Consequently, her statement is not hearsay under Fed.R.Evid.801(d)(2).

(Doc. 43 at 15). Rule 801 of the Federal Rules of Evidence provides that a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D).[7] The AOC is a division of UAHSF. The cited evidence establishes that Sojourner is Meek's administrative assistant (doc. 20-7 at 23), that she sent an email on January 4, 2011 "showing that the position . . . was posted after Walt's promotion," (doc. 20-4 at 108) that someone named Crystal "answered to Linda Sojourner," (doc. 24-3 at 14(54)) and that Sojourner is the "administrative assistant" or "administrative, uh, manager" (doc. 20-7 at 6(23-24)). None of this evidence establishes that Sojourner "had responsibility for job posting and management." Thus, plaintiffs have not established that the statement concerned "a matter within the scope of Sojourner's relationship" with the defendant. The statement will be **STRICKEN**.

---

[7]In a footnote, the plaintiff specifies this subsection of the rule. (Doc. 43 at 15, n. 24).

2.   ***"Walt Montgomery is less qualified than both John Riley and I.  Montgomery worked in the IT department and did not have any QA experience . . .."  (Doc. 24-2 at 4).***

The defendant argues that this is "[s]peculation, lay opinion testimony and not based on personal knowledge."  (Doc. 29 at 5).  The plaintiffs argue that Harris's <u>deposition</u> lays the foundation because she "has personal knowledge regarding Montgomery's lack of experience."   (Doc. 43 at 16) (citing doc. 20-5 at 5(132) (Harris deposition)).   The cited portion of the deposition does not discuss Montgomery's qualifications, or Harris's knowledge thereof.  Similarly, the plaintiffs cite to Harris's statement (in her deposition) that Montgomery would ask Harris and Riley for "help."  (Doc. 43 at 16) (citing doc. 20-4 at 17(63-64)).  That statement also does not establish a foundation for Harris to state in her declaration that Montgomery was "less qualified," or that he "lacked QA experience."

However, the plaintiffs also argue that Montgomery admitted to Harris that he was less qualified than Harris and Riley.  (Doc. 43 at 16) (citing 20-4 at 17(63) (Harris deposition)).  That statement is not hearsay because it was "made by a party's . . . employee (Montgomery) on a matter within the scope of [his employment] and while it existed."  FED. R. EVID. 801 (d)(2)(D).  Montgomery's statement to Harris <u>does</u> lay a foundation for Harris to say that Montgomery was less qualified than she and Riley.  That statement will be considered.   The remainder of the paragraph will

be **STRICKEN**.

> **3.**     *"After Montgomery was promoted in November 2010, I learned that the only white colleague in my department, Virginia Guindon, had been offered the position in January of 2010, before Joe Captain left on disability. Attached as Exhibit B is an excerpt of the transcript of a recorded conversation I had with Guindon when she confirmed that she had been asked if she was interested in Joe Captain's position. Guindon stated that, although they did not specifically offer her Captain's job, they asked her if she "would be interested" in the position. (Exhibit B)." (Doc. 24-2 at 5).*

The defendant argues that this is "[h]earsay and incomplete."  (Doc, 29 at 5). It is unclear what Harris means when she says "I learned."  Clearly she is referring to being told by someone that "Guindon, had been offered the position in January of 2010."  What is unclear is whether she is referring to the conversation with Guindon that she recorded, or if she is referring to a different conversation with Guindon, or a different conversation with a third party.  Because the plaintiffs refer in their response only to Guindon's statement, the court will assume that the entire statement refers to what Guindon told her.

Guindon's statement is an out of court statement, offered for the truth of the matter asserted.  The plaintiffs argue that "this evidence can be made admissible at trial," but do not explain how.  Since they cite to Guindon's testimony in her deposition, they may be arguing that Guindon herself could testify to these facts at trial.  While that is so, it misses the point.  It is Harris's statement, in her declaration,

19

<u>as to what Guindon said</u>, that the plaintiffs must show could be made admissible at trial. The plaintiffs have shown no basis for allowing <u>Harris</u> to testify at trial <u>as to what Guindon said</u> in their conversation. Similarly, the plaintiffs have shown no basis for allowing the tape recording (or a transcript thereof), which the court would not allow to be played at trial (other than for impeachment), to prove what Guindon said. It is all hearsay, subject to no exceptions. The only proper evidence of what Guindon said would be a declaration by Guindon, or deposition testimony by Guindon herself.

These statements, the tape, and the transcript of the tape, will be **STRICKEN**.

      **4.**      *"After we complained about discrimination, the position was posted so that we could apply. However, the QA Manager job description was changed in an attempt to add criteria that would exclude John Riley and I from consideration." (Doc. 24-2 at 5).*

The defendant only attacks the second sentence, which is pure speculation. There is no foundation to show that Harris could have personal knowledge as to why the additional criteria was added. The plaintiffs insist that the statement should be allowed because Harris has seen both descriptions and is familiar with the changes. However, that would only allow her to testify as to the <u>changes</u>, not <u>the reasons behind them</u>. The Eleventh Circuit has cautioned that, in the context of employment discrimination suits, "a discharged employee's mere suspicion of ... discrimination, unsupported by personal knowledge of discrimination, will not constitute [proof of]

pretext." *Sturniolo v. Sheaffer, Eaton, Inc.,* 15 F.3d 1023, 1026 (11th Cir.1994) (alteration supplied) (citing *Slaughter v. Allstate Insurance Co.,* 803 F.2d 857, 860 (5th Cir.1986)).  The challenged sentence will be **STRICKEN**.

> **5.** ***"When I complained about being overlooked for the QA Manager position, I did not complain to Dem Lalisan because I did not believe he was trustworthy. Lalisan had an inappropriate relationship with Paulette DiBenedetto, a QA Coordinator with absolutely no QA or organ procurement experience, whom he had hired. Lalisan had also instructed an employee to manipulate a consent form involving an infant donor. This was discovered upon review of the telephone conversation, which was routinely recorded by the AOC." (Doc. 24-2 at 6).***

The defendant attacks only the last two sentences.  Harris testifies to what was said during a conversation between Lalisan and an unidentified employee, which was recorded by a third party.  In other words, she is aware of the conversation, and what was said, because she listened to a recording of it.  This is a non-hearsay, out of court statement (the instruction by Lalisan to manipulate a consent form)[8] within hearsay (the recording of the instruction). The plaintiffs insist that the recording falls under the "records of a regularly conducted business activity" exception to the hearsay rule. *See* Fed. R. Evid. 803(6).  The defendant has not challenged the authenticity of the recording.  Thus, it appears that the defendant is not challenging that the tape

---

[8]Lalisan's statement is not hearsay.  He is an employee of the defendant and the statement was made by him on a matter within the scope of his employment and while it lasted.  *See* Fed. R. Evid. 801(d)(2)(D).

recording could be made admissible at trial.  The statement will be considered.

6.      *"There are several other examples of job postings that were manipulated to exclude or qualify certain employees." (Doc. 24-2 at 6).*

This vague and conclusory statement will be **STRICKEN**.

7.      *"The Certified Procurement Transplant Coordinator (CPTC) certification was added to the job description as a requirement in order to disqualify black employees who had Certified Tissue Banking Specialist (CTBS) certifications, which were more closely aligned with the responsibilities of the training manager." (Doc. 24-2 at 6)*.

Again, this is a conclusion.  The declaration lays no foundation for how Harris could know <u>for what purpose</u> the certification was added.  The statement will be

**STRICKEN**.

8.      *"The job description for the tissue recovery manager position was changed to require a CPTC certification, which excluded Renarkus Miller, a black AOC employee who had a CTBS certification. This change was not logical, as tissue recovery is heavily FDA regulated and it would not make sense to have a non-CTBS person managing the tissue area. After Alan Hicks was terminated, the job description was changed back to require CTBS certification." (Doc. 24-2 at 7).*

The defendant challenges the second sentence as speculation and lay opinion testimony.  It also argues that Harris lacked personal knowledge to make such a statement.  Since Harris has not been qualified as an expert, she can only give her opinion if it is comports with the requirements of Rule 701 of the Federal Rules of

Evidence.  Again, <u>as to this specific statement</u>, the plaintiff makes no attempt to explain how Rule 701 is satisfied, stating only that her statement "is based on [her] own perception regarding requirements for successful tissue recovery, which in turn is based on her many years of experience in the tissue procurement industry."  (Doc. 43 at 21).  Since the plaintiff has not carried her burden, the statement will be **STRICKEN**.

> **9.**     *"There was also a position that dealt with donor families, for which a black employee, Marshae Crum, expressed an interest to Dem Lalisan. The donor family position job description was changed to add a requirement for a Master's Degree in a particular field, such as social work. Only one employee at the AOC had that specific degree, Carrie Peter, who is white." (Doc. 24-2 at 7).*

The declaration provides no foundation for how Harris would have personal knowledge that it was a position "for which a black employee, Marshae Crum, expressed an interest to Dem Lalisan."  That portion of the statement is **STRICKEN**. The remainder of the statement is allowed.

> **10.**     *"Montgomery's position was announced as a 'promotion' in a staff meeting on November 9, 2010. The AOC staff meetings were routinely recorded.  An excerpt from the court reporter's transcript of the recording is attached as Exhibit A. Dem Lalisan, the AOC Director at the time, led the meeting. I have listened to the recording of the meeting and can positively identify the voice of "Speaker 1" as Dem Lalisan." (Doc. 24-2 at 4).*

The defendant argues that the first sentence is hearsay, and that Harris  could

23

have no knowledge as to what was actually said at the meeting because she did not attend.  Indeed, there is no foundation in the declaration for how Harris could have personal knowledge of what was said in the meeting, except, that she listened to what she says was a recording of the meeting.

This situation appears to present one out of court statement (Lalisan's statement at the meeting) within another out of court statement (the recording of the statement).  It is <u>not</u> hearsay within hearsay, however.  Lalisan's statement at the meeting is not hearsay because it is a statement, made by an employee (Lalisan) of a party (UAHSF)[9] "on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).

Still, the plaintiffs must show how the <u>recording</u> would be admissible.   They argue that the statement is admissible under Fed. R. Evid. 807 which provides:

> (a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> (1)    the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2)    it is offered as evidence of a material fact;
>
> (3)    it is more probative on the point for which it is offered than any

---

[9]Lalisan was the AOC's director from 2006 to 2011.  (Doc. 20-20 at 1).  The AOC is a division of UAHSF.

24

other evidence that the proponent can obtain through reasonable efforts; **and**

(4)    admitting it will best serve the purposes of these rules and the interests of justice.

(b)    Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

FED. R. EVID. 807 (emphasis added).

The defendant notes that "Harris did not attend the November 9, 2010, staff meeting or record the meeting. Accordingly, she cannot authenticate the content of the recording or verify the accuracy of the transcript." (Doc. 29 at 8). In response, the plaintiffs write:  "Harris has produced a properly authenticated transcript of the recording of Lalisan's statement to this effect, and identified Lalisan's voice as the speaker on the recording.  Therefore, Harris'[s] statement is admissible under Fed. R. Evid. 807." (Doc. 43 at 22) (citing (Doc. 24-2, ¶¶16-17 ("The AOC staff meetings were routinely recorded.  An excerpt from the court reporter's transcript of the recording is attached as Exhibit A. Dem Lalisan, the AOC Director at the time, led the meeting. I have listened to the recording of the meeting and can positively identify the voice of 'Speaker 1' as Dem Lalisan."); doc. 24-2 at 13-15).  The plaintiffs also note that: "This fact is material in that it shows the decision maker's state of mind. A highly disputed issue in this case is whether Montgomery was promoted in

November, or merely placed in an interim position, as the Defendant asserts." (Doc. 43 at 22).

Based on the plaintiffs' showing, the transcript will be considered.

> **11.** ***"It was also announced at the meeting that Montgomery would no longer be handling IT issues. Dem specifically stated, "Walt is not going to have time to spend doing the computer troubleshooting that he's done in the past." (Ex. A). From that point on, IT issues would be handled by two employees from the Department of Surgery." (Doc. 24-2 at 4).***

This statement will be considered for the same reasons as the previous statement.

### C.   <u>Declaration of Joe Captain (Doc. 27)</u>

> **1.** ***"Riley is a highly competent employee with superior qualifications and experience in quality assurance and quality improvement functions. During my absences in 2009 and 2010, John filled in for me and took over many of my responsibilities. For example, he worked with the donor charts and reviewed them for accuracy and completeness. He conducted internal audits of the AOC procurement facilities and sat in for me during the last AATB audit, which we passed." (Doc. 27 at 1-2).***

The defendant argues that Captain could not possibly have personal knowledge about what Riley did when Captain was away. In response, the plaintiffs state that "[t]his testimony is corroborated by Riley's own testimony[.]" (Doc. 43 at 23). That fact does not help Captain's statement in <u>his</u> declaration, which lacks any foundation for <u>his</u> personal knowledge.

The plaintiffs cite *Zaben v. Air Prods. & Chems.*, 129 F.3d 1453, 1457 (11th Cir. 1997), for the proposition that "where the person relating the statement to the declarant independently testifies, those statements may be permissible." (Doc. 43 at 23). It is unclear the point that the plaintiffs are trying to make. They seem to imply (but do not say) that Captain has personal knowledge about what Riley did, <u>because Riley told him so.</u> It would seem that they are arguing that, because Riley also testified to what Riley did for Captain, Captain's statement is valid. *Zaben* does not stand for that.

In *Zaben*, the declarant, an employee of the defendant, testified to what two other employees told <u>him</u> about what "others" in the company told <u>them</u>. *Zaben*, 129 F.3d at 1456. The court held that that testimony was "double hearsay" and was not admissible. It continued that

> If [the two other employees] had been deposed-or had furnished sworn affidavits-and had testified with respect to age-biased statements made by specifically identified, senior managers at the plant, their statements . . . might have been relevant and, therefore, permissible.

*Id.* at 1457 (emphasis supplied). That is not the same situation that is present in the instant case. *Zaben* is not helpful as to <u>Captain's</u> (as opposed to <u>Riley's</u>) statement.

The statement will be **STRICKEN**.

        2.       ***"Montgomery had no quality assurance or quality improvement experience that was documented. Nor did he perform any quality assurance duties in that position, to my knowledge.***

> *Montgomery's basic duties involved data entry and computer and technology related tasks. I was shocked to learn that Montgomery was placed in the QA Manager position in 2010. He was not qualified." (Doc. 27 at 3).*

The defendant correctly points out that the declaration lays no foundation for how Captain could have personal knowledge of Montgomery's qualifications. Captain merely states that he is "familiar with Walter Montgomery who worked in the IT department at the AOC during my tenure." (Doc. 27 at 3). It does not state how he would know what Montgomery's duties were in IT, or what he did while there. Further, the statement, "he was not qualified," is an impermissible lay witness conclusion. These statements will be **STRICKEN**.

> 3.   *"I was aware of the conflict in 2007 between Montgomery and another IT worker, Fran Lewis, who is black. According to Fran Lewis, Montgomery screamed at her and harassed her until she left in January of 2003. Lewis filed an EEOC charge alleging discrimination. Subsequently, Lalisan decided that Montgomery could never work in a supervisory position with the AOC in the future because of his lack of interpersonal and leadership skills. This fact was told to me by Dem Lalisan and widely discussed within the AOC management team. The above mentioned outbursts continued long after this encounter." (Doc. 27 at 3).*

The plaintiffs state that these statements can be "reduced to admissible form by either presenting . . . Lewis as a witness or by offering the EEOC documents as evidence." (Doc. 43 at 25). However, what is offered in opposition to the motion for summary judgment is not Lewis's declaration stating that "Montgomery screamed at

28

her and harassed her until she left in January of 2003," and thereafter "filed an EEOC charge alleging discrimination." Her declaration <u>could</u> be made admissible because she could testify at trial. However, here, the problem is that <u>Captain</u> is testifying <u>to what Lewis told him</u> about what happened. That is hearsay. That statement will be **STRICKEN**.

The declaration states that Lalisan told Captain that Lalisan "decided" that "Montgomery could never work in a supervisory position with the AOC in the future because of his lack of interpersonal and leadership skills." As shown in more detail in the ruling on the motion for summary judgment below, Lalisan was Captain's and Montgomery's superior who was responsible for promoting both into the position of QA Manager. Accordingly, his statement is not hearsay because it is a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). That statement is allowed.

> **4.    *"Montgomery lacked any qualifications or experience to perform competently in that position." (Doc. 27 at 3).***

The declaration lays no foundation for this statement. It will be **STRICKEN**.

## III.    THE PLAINTIFFS' MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF DEMOSTHENES LALISAN (DOC. 33)

### A.    <u>"One of the reasons the AOC received such poor scores was because</u>

**it entirely lacked a quality improvement ('QI' program or department." (Doc. 20-20 at 2).**

Lalisan made this statement after he noted that "the AOC was scoring poorly on its periodic audits by various outside agencies." (Doc. 20-20 at 2). To the extent that Lalisan is repeating the contents of the reports, this is hearsay. The reports will speak for themselves. However, the defendant states that this is "lay witness testimony based on his perceptions as the head of AOC." (Doc. 42 at 2). Actually, it is his <u>opinion</u> as to one of the reasons for the poor score. He may only give that opinion if it is: "(a) rationally based on [his] perception; (b) helpful to clearly understanding [his] testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. The defendant does not even cite this rule in defending this statement. Accordingly, it has not carried its burden to show that the statement is admissible. The statement will be **STRICKEN**.

B.     **"The auditing agencies strongly suggested to the AOC that it needed a quality improvement focus rather than just a quality assurance focus. In fact, AOPO and UNOS mandated the incorporation of quality improvement at the AOC and AOPO would not accredit the AOC until it implemented a quality improvement program." (Doc. 20-20 at 2-3).**

Here, too, Lalisan appears to merely restate his recollection of the contents of the reports. The defendant states that the statement is not hearsay because it is not

30

offered for the truth of the matter asserted, but instead to show that Lalisan "heeded the advice of the auditing agencies and decided to reclassify the Quality Assurance Manager position to include a quality improvement component." (Doc. 42 at 5). The court is not persuaded.  The purpose of the testimony is clearly to show the truth of the matter asserted–the mandates of the auditing agencies–as a justification for Lalisan's actions.  The statement will be **STRICKEN**.

C.     **"Because of the various audit results and the other issues in the QA department, Mr. Meeks, Mr. Hicks, and I decided to consider reclassifying the QA manager position to include both QA and QI components." (Doc. 20-20 at 3).**

Here, Lalisan impermissibly testifies, without laying an evidentiary foundation, to the mental impressions ("[b]ecause of") of Meeks and Hicks.  To the extent it includes Mr. Meeks's and Mr. Hicks's <u>reasons</u>, it will be **STRICKEN**.

D.     **"Mr. Montgomery was the best fit for the interim position for many reasons. He had been with the AOC for more than 20 years, had created databases and managed the data that the QA department produced, and had been performing quality assurance for the AOC through its call center, the financial record of the AOC, and records memorializing the disposition of all organs and tissues sent and received by the AOC. He had also participated in the structuring of the QA chart review process and created many of the forms and databases utilized during the QA department's chart reviews." (Doc. 20-20 at 4).**

This statement will be allowed.  Lalisan is competent to testify as to why he hired Montgomery for the position.  Although the plaintiffs argue that the paragraph

31

"appears to reference a conglomeration of documentary evidence and tangible sources in an effort to provide support for Lalisan's subjective opinion of Montgomery's 'fitness,'" there is no indication of that in the statement. Lalisan was Montgomery's direct superior. He would have been in the position to have personal knowledge of everything he states.

## IV.   THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.   Facts[10]

#### 1.   *The Alabama Organ Center ("AOC")*

The AOC, a division of UAHSF, is involved in both organ and tissue procurement for implantation.  It provides families with opportunities to donate organs and tissue, supports families regardless of whether they decide to donate, and promotes the equitable utilization of these gifts to others. Neither the AOC nor UAHSF is an agent of the state of Alabama and neither operates under color of law.

The operations of the AOC are routinely subject to audits from many different

---

[10]The "facts" herein, if not disputed, have been set out exactly as they were offered by the party who offered them, without citation to the record, unless quoted material is included.  In the case where a party offered a fact, and that fact was disputed, the court first checked to see if that fact was accompanied by a proper, and specific, citation to evidence in the record which supports the fact.  If not, the fact was not included.  In many such cases a footnote in this opinion indicates the omission.  If the evidence cited supported the fact as stated, the court then checked to see if the party disputing the evidence offered a specific citation to evidence in the record which disputed the fact.  If not, the fact was included as stated by the party offering it.  If, however, there was evidence supporting the dispute, the fact was cast, as this court must, in the light most favorable to the non-movant.

sources, including the Centers for Medicare and Medicaid Services (CMS).  The United Network for Organ Sharing (UNOS) is the private, non-profit organization that manages the nation's organ transplant system under contract with the federal government.  The American Association of Tissue Banks (AATB) is a professional, non-profit, scientific and educational organization.  The Association of Organ Procurement Organizations (AOPO) is the non-profit organization that has developed organizational and ethical standards for OPOs.  AOPO conducts a voluntary accreditation program involving a peer review process, conducted at the OPO, to help assure compliance with federal regulations as well as AOPO standards.

The principal auditing body is the Food and Drug Administration (FDA).  The FDA has ultimate regulatory control over the AOC's organ/tissue donation programs and is the only agency with the authority to completely shut down the AOC's operations if it determines that the public health is sufficiently jeopardized.  Along with the CMS, the FDA can discontinue the AOC's funding. The AOC has a "Quality Assurance" or "QA" Department.  The primary function of the QA Department is to make sure that the donor chart documentation is complete and verified to the specification of the various auditing agencies, including the Food and Drug

Administration.[11]

In 2010, the AOC had three QA "Coordinators." They were John Riley (African American), Genevieve Harris (African American) and Virginia Guindon (Caucasian). QA Coordinators are responsible for reviewing organ and tissue charts and acquiring missing information, ensuring completeness and accuracy of donor files, reviewing daily referrals for accuracy, providing follow-up to regulatory agencies, and participating in audits.

### 2.   *John Riley*

Riley has worked in the organ and tissue procurement field for approximately 22 years. Riley has a B.S. in Biology with a minor in Chemistry. In August of 1987, he began working at UAB as a research assistant in the Department of Physiology and Biophysics. In 1991, Riley began working at the Alabama Tissue Center (ATC) performing tissue procurement and cryo-preservation. (Doc. 24-1 at 2). He was involved in procuring tissue from cadavers for implantation. At the ATC, Riley also performed quality assurance and quality improvement functions. During his tenure, Riley became certified as a Certified Tissue Bank Specialist (CTBS) with the

---

[11]The defendant disputes this fact, stating that Riley "does not possess the requisite personal knowledge to offer testimony regarding the primary function of the entire QA department." (Doc. 28 at 2). Riley states that he "was hired by the AOC as a Quality Assurance Coordinator, working on performing quality assurance responsibilities for the AOC's organ donor program." (Doc. 24-1 at 4). That foundation is sufficient to support the statement.

American Association of Tissue Banks (AATB).

In approximately September of 2000, the ATC was purchased by a private company, Regeneration Technologies, Inc. ("RTI"). Riley continued working for RTI in the same capacity. While at ATB and subsequently RTI, Riley had supervisory duties on the weekend shift. In December 2006, RTI closed its tissue processing operation at UAB and moved the function to its main plant in Florida.[12]

On May 25, 2006, Riley began working for the UAHSF as a QA Coordinator at the AOC. Riley was "working on performing quality assurance responsibilities for the AOC's organ donor program." (Doc. 24-1 at 4). However, because Riley had extensive experience in tissue procurement and processing, he frequently helped out with the tissue program as well. Tissue donation is more heavily regulated by the FDA since tissue procurement and implantation involves extensive handling and processing. (Doc. 24-1 at 4). Riley was the only QA Coordinator who had both experience in organ donation and tissue donation. (Doc. 24-1 at 4). Riley also has extensive computer training and certifications.

Riley worked on revising Standard Operating Procedures ("SOPs") and investigated non-conformance in order to create audit compliance. Riley

_____

[12]Tissue processing is not a part of the operations of AOC. When tissue is procured by the AOC, it is immediately sent to any one of several outside tissue processing companies, of which RTI is one, for storage and processing.

implemented corrective action when necessary, as part of the AOC quality improvement objectives.  Riley attended AOC-wide quality improvement meetings and suggested ways for other departments to prevent recurring errors.  (Doc. 27 at 2). He reviewed deficient charts with the other AOC staff members so that corrections could be made.  (Doc. 27 at 2).  He handled requests from the processing partners and participated in training sessions offered by those partners. (Doc. 27 at 2). Riley maintained the training records that were requested by auditors during routine site visits.  (Doc. 27 at 2).  According to Joe Captain, who was the manager over Riley's department at one time, Riley handled "all of these responsibilities, and more, and performed these tasks flawlessly." (Doc. 27 at 2).

### 3.    *Genevieve Harris*

Genevieve Harris has a B.S. in biochemistry and is currently a doctoral student, at the University of Florida, in the area of clinical audiology.  Harris worked as Laboratory Instructor and tutor at Oakwood College in Huntsville, Alabama.  Harris also worked as a Research Assistant in Neurobiology at Oakwood College.  While attending the University of Virginia, Harris instructed college chemistry lab sessions and taught basic concepts of college level chemistry.  She also worked as a Research Assistant and conducted various research training courses.

Beginning in February 2003, Harris worked at the Southern Research Institute.

Her duties there included assisting in the development and implementation of Quality Control for the Robotics Systems.  In December of 2003, Harris began working at the ATC at UAB (which was later purchased by RTI), where she processed cardiovascular tissue for human implantation, developed SOPs to facilitate compliance, and performed Quality Control and QA functions.  At RTI, Harris was required to ensure compliance with the FDA and the AATB.  That position ended in July 2005.

In August 2005, Harris began working at the UAB Atherosclerosis Research Unit as a Research Technician.   She began working at the AOC as a Quality Assurance Coordinator on July 2, 2007.

### 4.   *Riley's and Harris's Most Recent Performance Evaluations at the AOC.*

At the AOC, scores on the performance evaluations are rated on a scale of 1 to 3.  A score of "1" means "below standard," a score of "2" means "meets standards" and a score of "3" means "exceeds standards."   Riley and Harris both received perfect scores on their most recent performance evaluations (2009) for all responsibilities listed on their job description.  (Doc. 20-7 at 29(113-115)).

### 5.   *Management Structure of AOC*

When Riley was hired in 2006, Joe Captain was the QA Manager.   Until September 2010, Riley and Harris reported to Captain.  Guindon,  who worked

part-time, was a former procurement coordinator.  Her work has been almost exclusively in organ donation.

Captain reported to Dem Lalisan.  Lalisan was the AOC's Director from 2006 to August 2011. (Doc 20-20 at 1).[13]  Lalisan reported to Chris Meeks, Executive Administrator for the Department of Surgery.  Since August 2011, Meeks has also served as the AOC's Executive Director.  Alan Hicks was the AOC's Associate Director from August 2006 to August 2011.  It is unclear to whom he reported.

### 6.    *The Performance of the QA Department*

By 2010, Meeks and Lalisan were concerned with the performance of the QA department.  (Doc. 20-22 at 2-3; doc. 20-20 at 2).  The QA department was behind on their chart reviews, which resulted in a backlog.

The defendant insists that Meeks and Lalisan wanted to include a "Quality Improvement" aspect to the department.[14]  In his deposition, Meeks testified that Captain's position was "QA," or quality assurance, manager.  (Doc. 20-7 at 15(60)).

---

[13]The last two sentences are facts proffered by the defendant.  As proffered, they were combined as: "Captain reported to Dem Lalisan . . . the AOC's Director, from 2006 to August 2011."  (Doc. 21 at 3).  When written that way, it appears to state that Captain reported to Lalisan from 2006 to August of 2011.  However, it is undisputed that Captain left in 2010.  Because the plaintiffs disputed this fact as offered, it has been changed to comport with the undisputed evidence.

[14]In support of this argument, the defendant has attempted to cite evidence of recommendations by auditing agencies.  The recommendations themselves were not submitted. Instead, the defendant has attempted to use Lalisan's statements as to the contents of those recommendations.  Those statements will be stricken as noted above in subsections III.A.-B.

Exactly how much quality "improvement" authority/function he had is disputed. By the time Montgomery took over the position, the title had been changed to "Manager QA/QI," or Manager Quality Assurance/Quality Improvement. (Doc. 20-7 at 15(60)). Still, Meeks agreed that even before this change, if the "QA" manager saw errors, he could make a recommendation for change or improvement. (Doc. 20-7 at 16(62)).

In his declaration, Riley stated that

Quality Improvement functions were already present in the QA department. While Captain was still manager, they were instituting the QI SOP that was in place and conducting regular AOC-wide QI meetings, where the department heads met monthly to discuss QI issues.

(Doc. 24-1 at 8). In his deposition, Lalisan stated:

Q. Wasn't there a period of time where you had actually instituted QA -- I'm sorry -- QI SOP and you started having QI meetings? Do you remember that?

A. Yes.

Q. Well, that was all during the time that Mr. Captain was there, wasn't he?

A. Yes. We were trying to develop, uh, at least aspects of a quality improvement which obviously didn't suffice to what needed to –

(Doc. 24-3 at 23(92)).

7.   *Captain's Departure and Discussions about Reclassifying the QA Manager Position*

In March 2010, Captain began taking intermittent leave that eventually became

39

a continuous leave of absence in June 2010.  In September 2010, UAHSF was notified that Captain was approved for long term disability benefits and would not be returning to work.[15]

With Captain's departure, UAHSF had to decide whether to fill the QA Manager position or to change the nature of the position. (Doc. 20-20 at 3; doc. 20-22 at 3).  Given the poor scores that the AOC had received on various quality control audit reports, Meeks, Hicks, and Lalisan decided to reclassify the position to encompass both QA and QI (quality improvement). (Doc. 20-20 at 3; doc. 20-22 at 3).[16]

On or about September 9, 2010, Lalisan, Hicks, and Meeks met with Jeannie Singer and Julie Makosky from Human Resources to discuss their options regarding

---

[15]Before Captain officially left the AOC, when it seemed that he would not be returning, Riley mentioned to Lalisan that he was interested in Captain's position.

[16]The evidence supporting this fact has not been attacked.  However, the plaintiffs dispute this fact by citing to their own facts.  (Doc. 23 at 4).  They write: "Disputed.  See Pla. Facts Nos. 56-58." (Doc. 23 at 4).  The plaintiffs' cited facts in turn read:

> 56.    There was an existing job description for the QA Manager position Joe Captain held, which had just recently been revised in April of that year. (DX7, pp. 59-60; PX20).

> 57.    Hicks and Lalisan decided to significantly revise Joe Captain's job description.  (DX6, p. 106).

> 58.    Hicks and Lalisan were aware of Plaintiffs' complaints of discrimination.  (DX5, p. 20; DX6, pp. 145-146; DX7, p. 49; PX19).

(Doc. 23 at 14).  None of these facts disputes the defendant's proffered fact.

the QA Manager position.[17] (Doc. 20-20 at 30.)  The plaintiffs insist that the purpose of the meeting was to <u>fill</u> the position.  Makosky testified, at different times, both that the purpose of the meeting was to <u>reorganize</u> the position left open by Captain (doc. 20-16 at 17(67)), and to <u>fill</u> the position left open by Captain (doc. 20-16 at 14(56)).  However, she also testified that they discussed that they wanted to change the responsibilities of the position to add "process improvement" to the position.  (Doc. 20-16 at 16(61-62)).  She defined "process improvement" as "needing to find a way to look at not just the actual chart review but the entire process of looking more at trends and things like that."  (Doc. 20-16 at 16(62)).  In any event, it is clear that Lalisan, Hicks, and Meeks told Singer and Makosky that, while they assessed the future of the role, they needed someone to manage the QA department on an interim basis to address the immediate issues facing the department, including the backlog.[18] (Doc. 20-20 at 3; doc. 20-22 at 3).

Meeks, Lalisan, and Hicks told Singer and Makosky that they thought Walt Montgomery would be a good person to fill the QA Manager role on an interim basis

---

[17]The plaintiffs dispute this fact, stating that the purpose of the meeting was to "fill" Captain's position.  They cite to a portion of Singer's deposition which does not support their dispute, and to a portion of Makosky's deposition (doc. 20-16 at 14(56)) which does.  (The court discusses Makosky's statements later in this opinion.)  They also cite to plaintiffs' facts 56-58 in disputing this fact.  The court does not see how any of the facts cited by the plaintiffs controvert the defendant's proffered fact.

[18]Disputed by the plaintiffs with only a reference to plaintiffs' facts 56-58.  Again, these facts do not dispute the defendant's proffered fact.

while they created a new job description.[19]  (Doc. 20-20 at 3-4; doc. 20-16 at 18(69-70)).  Singer raised the issue of Montgomery's interpersonal problems.  (Doc. 20-14 at 26(103-1-4)).  Singer stated:

> My -- my recollection is that his approach is gruff.  Uh, he's, uh -- the former military comes up a lot when -- when referencing Walt and his interactions with others, that he's formerly from the military.  Uh, harsh is sometimes a word that's been described, gruff.  Uh, those types of descriptions of Walt's interpersonal interactions have come up.

(Doc. 20-14 at 11(44)).  Harris testified that Montgomery could not communicate with people effectively.  (Doc. 20-5 at 6(133)).  Harris stated that Montgomery "has rubbed a lot of people the wrong way."  (Doc. 20-5 at 5(132)).[20]  Although Lalisan and Montgomery had some difficult working relations in 2007, Lalisan felt they had

---

[19]At some point, Lalisan and Hicks had asked Guindon if she would be interested in taking on more responsibility in the department.  (Doc. 20-19 at 6(23)).  In her deposition Guindon testified that in response she "told them that [she] did not feel that [she] was prepared for that position."  (Doc. 20-19 at 7(28)).  She stated that she did not have enough experience in "training."  (Doc. 20-19 at 6(728)).

[20]For the reasons stated in subsection II.C.3. *supra*, the court has not included the following fact, offered by the plaintiff, the support for which is entirely hearsay statements:

> 111.   Fran Lewis (black), another IT employee, complained that Montgomery screamed at her and harassed her, and she ultimately filed an EEOC charge.  (DX6, p. 32; DX8, p. 21; PX26, ¶8).

(Doc. 28 at 5).  Also, the following fact, which is not supported by its evidentiary citation, has not been included:

> 112.   Lalisan wanted to subordinate Montgomery and bring John Riley into the IT department in order to integrate the QA/QI functions with IT.  (PX11, p. 3).

(Doc. 23 at 21).

worked beyond their differences and Montgomery would be a good interim manager.

(Doc. 20-20 at 3-4).

Singer stated that "[Lalisan, Hicks, and Meeks] felt that Walt could be, uh, an interim to start working on that backlog and putting some processes in place." (Doc. 20-14 at 28(110)).  Singer testified:

> Q. So as you attended that meeting, uh, tell me in your own words what you recall the topic or topics were that were being discussed.
>
> A. Okay. We, uh, went in and sat at Chris' table. Uh, just the topic, uh, the conversation began that they were looking at an AOC reorganization. Uh, they had had some recent audits. Uh, we were already aware that Joe Captain had been out of the office, was pending a long-term disability decision, and would soon be formally exiting the position. Uh, they talked about the – a backlog. They talked about the audit results, the pressures that they were under to get that backlog addressed and to respond to these audit findings. Uh, I believe there was a monetary amount talked about. I don't know the specifics on -- on that. Uh, they -- they talked about evaluating their options with addressing the backlog, and, uh, they mentioned the, uh, thought behind combining the QA and QI function that had previously been separate, uh, that they felt that that would be a better approach to more comprehensively, uh -- more -- have a more comprehensive QA process. Uh, said, We evaluated internal options or something to those words; we feel that, uh, Walt has some capabilities to –

(Doc. 20-14 at 23 (91-92)).  She continued:

> I remember that [Lalisan] said after the initial discussion of here is where we are, so to speak, with the backlog, the audit results, the pressures that are on us, the -- the urgency of -- of working through this issue. And then -- then the discussion went to we've got a vacancy. We're gonna look at reclassifying it, combining these two functions, uh, reclassify the vacancy. Uh, we have an internal option who's had  prior

issues we feel is worth with the investment. Uh, he said, Kind of surprised that I'm saying it, but he's really, uh, been a success. And, uh, you know, they thought he had the talents to help address this backlog and to put a -- a process in place that could address it going forward.

(Doc. 20-14 at 25(98)).   Makosky stated: "We weren't talking about making [Montgomery] the manager.  We were talking about giving him interim oversight over the area."  (Doc. 20-16 at 19(75)).  In her deposition, Makosky agreed that "the other existing staff members had really relevant and direct experience with quality assurance in the AOC."  (Doc. 20-16 at 21(82)).  However, Meeks testified that Riley and Harris were not considered for the QA Manager position in November 2010. (Doc. 20-7 at 11(41)).

Makosky and Singer told Lalisan, Hicks, and Meeks that it was permissible to fill the QA Manager job on an interim basis.[21]  (Doc. 20-23 at 2).  Accordingly, in November 2010, UAHSF asked Montgomery, and Montgomery agreed, to take on the management of the QA department on an interim basis.[22]  (Doc. 20-18 at 7(26), doc. 20-7 at 9(36)).  On November 8, 2010, Hicks and Lalisan called Riley and Guindon

---

[21]Disputed by the plaintiffs with a citation to plaintiffs' facts 56-58.  (Doc. 23 at 5).  How these facts dispute the defendant's proffered fact is unclear.  At the hearing on these motions, the court asked plaintiff's counsel if he could clarify how these facts dispute the defendant's proffered fact and he stated that he could not.

[22]Disputed by the plaintiffs with a citation to plaintiffs' facts 56-58.  (Doc. 23 at 5).  How these facts dispute the defendant's proffered fact is unclear.  At the hearing on these motions, the court asked plaintiff's counsel if he could clarify how these facts dispute the defendant's proffered fact and he stated that he could not.

into a meeting and told them that Montgomery was being placed in the QA Manager's position. Lalisan announced at a staff meeting the next day that Montgomery was being "promoted" to the manager role. (Doc. 24-2 at 4). It is the defendant's general practice to post positions. (Doc. 20-14 at 40(157)). However, the interim position was not posted before it was given to Montgomery. (Doc. 20-4 at 18(65)).

Makosky and Meeks both testified that Montgomery did not receive any additional pay or benefits as interim manager. (Doc. 20-16 at 19(74); doc. 20-8 at 8(146)). However, it is undisputed that he received a 5% pay increase, effective December 1, 2010.

### 8.   *Walt Montgomery*

Montgomery, the Information Systems Specialist II or Data Manager, had been with the AOC for more than 20 years, had built the AOC's databases, and managed the data that the AOC produced.[23]  (Doc. 20-18 at 3(11)).  He did not supervise any subordinate employees in that position. (Doc. 20-18 at 3(11)). He had been involved in the audits of the AOC operations. (Doc. 20-20 at 4). Additionally, Lalisan and Meeks noted that Montgomery had a long track record with the AOC as a hard

---

[23]This and several other of the defendant's proffered facts regarding Montgomery's experience and qualifications were disputed by the plaintiffs with a reference to their own facts on the subject. (Doc. 23 at 4, citing plaintiffs' facts 39-46 and 56-58). The court has included all of the defendant's and the plaintiffs' facts on this subject to the extent that they were supported by the evidence and do not contradict each other. To the extent that a contradiction arose, the court cast these facts, as it must, in the light most favorable to the non-movants.

worker and they felt confident he would dedicate the time and effort required to address the backlog. (Doc. 20-20 at 4; doc. 20-22 at 4).

Both Lalisan and Meeks stated that Montgomery had performed some quality assurance functions as well.  (Doc. 20-22 at 4; doc. 20-20 at 4).  These included

> QA on incoming referrals that came to the AOC through its call center, the financial records of the AOC, and records memorializing the disposition of all organs and tissues sent and received by the AOC.  He had also participated in the structuring of the QA chart review process and created many of the forms and databases utilized during the QA department's chart reviews.

(Doc. 20-20 at 4).  He had also participated in structuring the QA chart review process and created many of the forms and databases utilized during the QA department's chart reviews.  (Doc. 20-20 at 4).  While at the AOC, Montgomery never worked with tissue donors.[24]  (Doc. 20-19 at 9(33).

Prior to Montgomery working for the AOC, his previous jobs were all with the military.  (Doc. 20-7 at 18(69); doc. 20-14 at 42(167)).  A letter of recommendation from Major Thomas M. Coit reflects experience during that time in supervision, "personnel management, guiding and leading maintenance technicians."  (Doc. 24-5 at 2).  Another letter from CMSgt Charles Woodhead states that Montgomery had "unparalleled" leadership, management, and organizational skills.  (Doc. 24-5 at 3).

---

[24]The original fact, as proffered by the plaintiffs, continued "and did not have experience in the QA processing of donor charts."  (Doc. 23 at 12).  None of the plaintiffs' evidentiary citations support this portion of the plaintiffs' proffered fact.

Neither letter discusses QA functions.  Montgomery did not mention any QA related qualifications or experience in his cover letter when he applied for the AOC in 1991. According to his resume, Montgomery's experience was primarily in aircraft maintenance.  (Doc. 24-7 at 1).[25]

In his last performance evaluation before he took over interim responsibilities, Montgomery was assessed in a number of different categories and assigned points on the basis of whether he was below standards (score of "1"), met standards (score of "2"), or exceeded standards (score of "3").  (Doc. 24-4 at 2).  He scored no "3s" in any category and received an average score of 2.76.  (Doc. 24-4 at 2-3).

Although Montgomery had over 10 years of management experience (doc. 20-22 at 6-8), it is undisputed that he had not supervised any employees since 2000. Montgomery admitted to Harris that he was not as qualified as Harris and Riley for the manager position.  (20-4 at 17(63)).[26]

Singer stated that, to her knowledge, Montgomery had not worked in QA at the AOC.  (Doc 20-14 at 29(116)).

---

[25]The plaintiffs also proffer: "The only mention of QA in his resume was his assignment to the Quality Assurance Division from November 1988-June 1990 (less than 2 years)."  (Doc. 23 at 12 (citing doc. 24-7).  The evidence cited does not support this fact.  It will not be included.

[26]The plaintiffs also proffer: "Montgomery often asked Riley and Harris for assistance in his management duties, and referred to them as 'subject matter experts.'" (Doc. 23 at 23) (citing doc. 20-1 at 18(63-64)).  The citation does not support this statement, and it will not be included.

### 9.    *Plaintiffs' Complaints to UAHSF*

On December 8, 2010, Harris met with Singer in Human Resources and said she thought it was unfair that Montgomery was made the QA Manager without the job being posted and she thought the decision was racially discriminatory.  Harris also mentioned to Singer that Riley had the same complaints.  Singer said she would investigate and get back with Harris.  Singer was clear in her deposition that she did not tell Harris <u>at that time</u> that the position was only temporary.  (Doc. 20-14 at 33(131)).

On December 9, 2010, Riley met with Makosky and also complained that he was being discriminated against because he was not considered or allowed to apply for the manager position.  (Doc. 24-1 at 6).  Makosky did not mention to Riley at the December 8, 2010 meeting that Montgomery's position was only "interim."  (Doc. 24-1 at 6).

Singer and Makosky then met with Meeks and Lalisan on December 14, 2010.  Lalisan told them that he thought that, when he announced the change, he had said that Montgomery's position was interim.  He said that if he did not, it was a mistake, and that Montgomery understood it was interim.  (Doc. 20-20 at 5; 20-4 at 16(58)).  Lalisan confirmed that they were creating a new job description and planned to post the new position. (Doc. 20-20 at 5).

48

On or about December 16, 2010, the plaintiffs met with Lalisan and Meeks to discuss the position.[27]  Harris asked Lalisan "if he recalled promoting [Montgomery], and [Lalisan] said if [he] used the word[] promote [he] was wrong."  (Doc. 20-4 at 16(58)).  Riley asked why he was not being considered for the position.  (Doc. 20-1 at 35(134)).  Lalisan and Meeks made it clear at the meeting that they endorsed Montgomery 100% , and let the plaintiffs know that a new position would be posted and they would be able to apply for it. (Doc. 20-4 at 16(57-60); doc. 20-1 at 35(135); doc. 20-20 at 5).

### 10.    *The Transformation From Quality Assurance to Quality Assurance/Quality Improvement*

When Captain left, he held the position of "Quality Assurance Manager." (Doc. 25-9 at 1).  As revised in April of 2010, his written "Job Description" contained the following "Job Summary:"

> The Quality Assurance Manager is responsible for developing and administering Alabama Organ Center's (AOC)'s quality management system. The manager continuously assesses the quality processes throughout the organization through benchmarking, process improvement, surveys, Continuing Quality Improvement (CQI) teams, and data analysis, establishment of risk management policies and practices, and problem-solving projects.  Is responsible for enhancing the operational effectiveness of quality system functions by recommending solutions to reduce system complexities and/or

---

[27]The plaintiffs proffered fact states that they were meeting "to discuss their complaints of discrimination."  (Doc. 23 at 14) (citing doc. 20-1 at 35(133), doc. 20-4 at 15(56), doc. 20-16 at 29(115-116)).  None of the cited evidence supports this characterization.

inefficiencies. The Quality Assurance Manager actively fosters an organizational culture that is based on collaboration, support and constructive feedback. In collaboration with the organization's management team, monitors, promotes and implements quality as it relates to organizational goals and objectives, services and work processes. Identifies and coordinates implementation of local, state, and federal organ/tissue procurement regulations thereby ensuring compliance with regulatory, accreditation, and legislative standards. This includes Center for Disease Control (CDC) safety guidelines and Food and Drug Administration (FDA) current good tissue practices. Directs quality audits of all operations assuring corrective actions are implemented as needed.

(Doc. 25-9 at 1; doc. 20-16 at 15(60)-16(61)).  The position required: "Bachelor's degree or professional degree, i.e. RN, LPN, PA, etc. Experience in healthcare field in ancillary capacity.  Four years quality assurance or quality control experience." (Doc. 25-10 at 1).

Meeks, Lalisan, and Hicks decided that the QA department needed a Quality Improvement ("QI") component.[28] (Doc. 20-20 at 3; doc. 20-22 at 3).   In his declaration, Riley states:

Quality Improvement and Quality Assurance are complementary means of attaining continual improvement in quality of processes. While Quality Improvement, which is obviously aimed at improving existing processes, measures where you are and figures out ways to make things better.

(Doc. 24-1 at 7).  Lalisan, in his affidavit, states:

---

[28]The plaintiffs dispute this fact, stating that "QI functions were already present in the QA department."  (Doc. 23 at 14).  The evidence cited for that fact has been considered and included elsewhere in this opinion.

A QA/QI department, unlike a QA department, is a systems-based organization that continuously measures quality by retrieving, compiling, organizing, and analyzing performance data.

(Doc. 20-20 at 3).  A QA/QI Manager, unlike a QA Manager, not only manages the QA team's chart review, but also retrieves data on the review process, analyzes that data, and devises ways to improve productivity. (Doc. 20-20 at 5-6). With these changes in mind, Lalisan assigned Hicks the responsibility of preparing the initial draft of the new management job description.

Hicks developed the first draft of the new position on December 27, 2010. (Doc. 2013 at 16; doc. 20-12 at 9(35)).  In that draft, the position name was: "Program Manager of Quality Assurance/Quality Improvement/Information Technology." (Doc. 20-13 at 16).  Hicks made that change. (Doc. 20-12 at 10(37)). The job summary for that position was:

> The Quality Assurance Manager is responsible for developing and administering Alabama Organ Center's (AOC)'s quality management system. The manager continuously assesses the quality processes throughout the organization through benchmarking, process improvement, surveys, Continuing Quality Improvement (CQI) teams, and data analysis, establishment of risk management policies and practices, and problem-solving projects.  Is responsible for enhancing the operational effectiveness of quality system functions by recommending solutions to reduce system complexities and/or inefficiencies. The Quality Assurance Manager actively fosters an organizational culture that is based on collaboration, support and constructive feedback. In collaboration with the organization's management team, monitors, promotes and implements quality as it relates to organizational goals and objectives, services and work

processes. Identifies and coordinates implementation of local, state, and federal organ/tissue procurement regulations thereby ensuring compliance with regulatory, accreditation, and legislative standards. This includes Center for Disease Control (CDC) safety guidelines and Food and Drug Administration (FDA) Current Good Tissue Practices. Directs quality audits of all operations assuring corrective actions are implemented as needed. Collects and performs quality assurance analyses on all referral, donor, and organ offer data in order to ensure data integrity. Serves to develop, maintain, and modify databases, queries, and reports to facilitate the output of information. Provides input, guidance, and obtains computer software and hardware to ensure the Alabama Organ Center functions efficiently and effectively. Liaises is with UNOS and serves as DonorNet advisor to facilitate access and input of donor related information.

(Doc. 20-13 at 16).  The written "Education and Experience" for this position were:

> **_Required:_** Experience in healthcare field in ancillary capacity.  Five years experience in an Organ Procurement Organization (OPO).  Four years quality assurance or quality control experience.  Three years in middle to upper management.

> **_Preferred:_** Bachelor's degree or professional degree, i.e. RN, LPN, PA, etc.

(Doc. 20-13 at 16).  This new job description combines, word for word, Captain's old job description with Montgomery's old job description.[29]  Hick's next draft, dated

---

[29]Everything in the new description, from the first word, down to "assuring corrective actions are implemented as needed" is <u>Captain's</u> complete job description.  The remainder is <u>Montgomery's</u> complete job description from his Information System's Special II position which read:

> Collects and performs quality assurance analyses on all referral, donor, and organ offer data in order to ensure data integrity. Serves to develop, maintain, and modify databases, queries, and reports to facilitate the output of information. Provides input, guidance, and obtains computer software and hardware to ensure the Alabama Organ Center functions efficiently and effectively. Liaises with

December 28, 2010, appears to have the exact same title, summary, and education and experience requirements.  (Doc. 20-13 at 22).

Captain's job description had required a "Bachelor's degree or professional degree, i.e., RN, LPN, PA, etc."  and did not allow for any alternatives of substitutions for the educational requirement.   Hick's drafts did not include the same requirement.  It is undisputed that, when Hicks was revising the job description, he knew that Montgomery did not have a college degree.  Despite the fact that Lalisan had announced in November 2010 that Montgomery would not continue performing any IT functions, Hicks added to the job summary IT responsibilities which were taken directly from Montgomery's prior IT job  description.

After Hicks completed the drafts, he sent them to Lalisan and then to Kristi Eatmon so that UAHSF's HR department could review it.   Lalisan reviewed and approved all of Hicks's revisions.  Singer testified that Lalisan and Hicks were aware of the plaintiffs' complaints of discrimination.[30]  (Doc. 20-14 at 37(145-146)).

Julia Embry is the HR Manager for Compliance. In her deposition, Embry

_____

UNOS and serves as a DonorNet advisor to facilitate access and input of donor related information.

(Doc. 24-4 at 1).

[30]The defendant only objects to this fact, offered by the plaintiffs, as not being supported by the evidence cited.  The court finds that the evidence does support it.

testified that she does "job analyses." (Doc. 20-10 at 8(30)). She testified that when the department wants to set up a "new" position, one that is like no other in the company, she

> look[s] at the responsibilities of that position. I look at the job summary, at the individual responsibilities of that position. . . . I also would look for within the company do we have anything similar to that in another department that I could use for comparison. There have been times that I will go out – –, if it's a position that requires a special certification, that I'll go out to that credentialing agencies website to see – you know, to determine if they have any information about what's required for that position. But it is the department managers responsibility to write the job description.

(Doc. 20-10 at 8(31)). It is also her responsibility to approve the job description that is submitted. (Doc. 20-10 at 8(31)). When asked in her deposition what standards she uses for that, she stated:

> Depending on the responsibilities, if they're responsibilities that require special certification, I – I approve against those. I also prove within our own internal standards in regard to the level of the position. . . . [W]e have compensation standards that outline for us what different levels of positions are, . . . and I review it based on those in terms of the scope of responsibility.

(Doc. 20-10 at 8(32)). She is looking to make sure:

> that the job description matches what the summary is, that all of the requirements of the job description in terms of educational and experience requirements are valid… based on the responsibilities and that they are in the correct – you know, the correct formatting. And then I'm also looking to make sure that we, that there [sic] placed appropriately on our compensation grades.

(Doc. 20-10 at 8(32)-9(33)).  When asked what she meant by "valid," she stated: [t]hat is the department has proposed a – a title or something and then they've put a responsibility in there that doesn't necessarily match . . . what would be standard for something at that level." (Doc. 20-10 at 9(33)).  Her reference materials include her experience, and "compensation guidelines" to which she refers.  (Doc. 20-10 at 9(33)).  The compensation guidelines basically suggest, based on the position level, within which compensation category the position should fall.  The compensation guidelines do not provide the job selection criteria that should be used for any particular position.  Embry has never been involved in "a formal validation study." (Doc. 20-10 at 9(35)).

In reviewing the revised job description, Embry referred to the QA Manager description created in 2004, instead of the current April 2010 version.  Embry looked at the responsibilities in the revised job summary to see if there were similar positions within the company that she could use for comparison.

Embry added the following to the requirements for the new position: "Bachelor's or professional degree required, however directly related experience may be considered in lieu of degree requirement."  She also added the following requirement: "Three years in middle to upper management." (Doc. 20-11 at 1).  The final version read:

> **_Required:_** Bachelor's or professional degree required, however directly related experience may be considered in lieu of degree requirement. Experience in healthcare field in ancillary capacity.   Five years experience in an Organ Procurement Organization (OPO) including four years in quality assurance or quality control.  Three years in supervisory or management position.
>
> **_Preferred:_** Bachelor's degree or professional degree, i.e. RN, LPN, PA, etc.

(Doc. 25-11 at 1).  When Embry included the educational requirements, she did not consider whether an IT person, with no QA experience, would be qualified.  (Doc. 20-10 at 18(69)).  Captain's most current job description, dated April 2010, did not require management or supervisory experience.

The revised job description was posted on January 4, 2011.  (PX22).  After Montgomery was given the position, Lalisan could remember nothing specific that happened "to make this or to implement this QI program."  (Doc.  24-3 at 22(86)).

## 11.   *Filling the QA/QI Manager Position*

Riley, Harris, and Montgomery applied and interviewed for the QA/QI Manager position.  However, according to Makosky, Riley and Harris were not qualified because they did not meet the minimum requirements for the position.  (Doc. 20-16 at 27(105-106)).  She testified that the plaintiffs were allowed to interview because they had expressed interest in the position.  (Doc. 20-16 at 27(105-106)).  In Captain's opinion, Harris was well-qualified to be promoted to the QA/QI

Manager position.  (Doc. 27 at 3).

Meeks and Lalisan reviewed each applicant's resumé and conducted the interviews.  During the interview process, Meeks recalls that he asked each candidate to come forward with a plan on how to reorganize the QA department to get better results.   In his deposition, he states that each candidate's response to Meeks's question regarding his or her plan for obtaining better results in the QA department was most indicative to Meeks as to who should fill the QA/QI Manager position.  (Doc. 20-7 at 12(48)-13(49)).  However, at his deposition, Meeks testified that he could not recall specifically <u>all</u> of the answers from all of the candidates.  (Doc. 20-7 at 13(49)).

Lalisan asked each candidate about his or her work experience, supervisory experience, and goals each wanted to achieve should he or she be selected to fill the QA/QI Manager position.  (Doc. 20-20 at 6).

At the time of his deposition, Meeks did not recall anything specific about Riley's response to the request for a plan.  (Doc. 20-7 at 13(49)).  Meeks recalls that Harris proposed that the department facilitate better training, which would impact the QA process. Harris responded that a solid training program was needed to minimize

the error rate which would speed up productivity for the organization as a whole.[31]
She also responded that she would help implement a system of accountability within
the organization.   Harris's proposal regarding better training was impressive to
Meeks.   She also mentioned "root cause analysis."   (Doc. 20-20 at 7).   Lalisan
believed that Harris's answers demonstrated a focus on the quantitative aspects of
QA, without regard to a QI component.  (Doc. 20-20 at 7).  Lalisan recalls that Harris
mentioned that she did not know anything about organ regulations and that her only
supervisory experience was her leadership in her church choir.  (Doc. 20-20 at 7).

Riley responded by discussing the need for training, which was lacking in the
department.   He also discussed the need to develop a program for tracking errors.
Riley stated in his interview that "root cause analysis" should be used as a method of
problem solving. In his declaration, Riley stated:

> During the interview, I described my work history prior to the AOC and
> my job duties and responsibilities as QA Coordinator at the AOC. I was
> asked [to] discuss my plan on how to improve the department. I
> discussed the need for training, which was lacking in the department. I
> also discussed the need to develop a program for tracking errors.
>
> I also responded that root cause analysis should be used as a
> method of problem solving that tries to identify the faults or problems
> that cause operating events. Using this method, we solve problems by
> attempting to identify and correct the root causes of events, as opposed

---

[31]Lalisan recalls that Harris said she wanted to implement a training program to promote
increased chart flow, consistency, and accountability in the QA department.  (Doc. 20-20 at 7).

to simply addressing their consequences. By focusing correction on root causes, you can prevent the problem from recurring.[32]

(Doc. 24-1 at 7).[33]   In his affidavit, Lalisan agrees that Riley mentioned root cause analysis, "but [he] did not explain how such analysis might improve the QA department." (Doc. 20-20 at 7).

Meeks recalls that Montgomery came forward with an organizational approach on how he would assign work duties and tasks within the department. (Doc. 20-7 at 14(53)). Montgomery also presented proposals on how the department could better define its SOPs. (Doc. 20-7 at 14(53)). In Meeks's opinion, Montgomery's response demonstrated the most comprehensive understanding of the QA/QI process. (Doc. 20-7 at 14(53-54)). Montgomery was never asked for the specifics of his plan and Meeks did not ask if Montgomery actually had any experience in the tasks and areas he mentioned.

Lalisan recalls that Riley discussed his vast experience in the tissue processing and distribution industry when asked about his prior work experience. (Doc. 20-20 at 7). When asked about his goals, Riley said he wanted to perform internal audits

---

[32]There is no evidence that Riley "explained" root cause analysis to Lalisan, as plaintiffs claim.

[33]Riley testified at one point that Meeks told him during the interview that Montgomery would remain in the position. (Doc. 20-1 at 22(83-84)). Later, he admitted that he did not know when he was told this. (Doc. 20-1 at 37(144)-38(145)).

and establish a central control center.  (Doc. 20-20 at 7).

Montgomery discussed his QA/QI experience in the Air Force and the AOC. (Doc. 20-20 at 6).  He also discussed his experience supervising employees in his role as the AOC's Data Manager.  (Doc. 20-20 at 6). When asked about his goals, Montgomery talked about implementing programs and processes that would provide opportunities for improvement throughout the QA department and the other departments in the AOC. (Doc. 20-20 at 6).  In Lalisan's opinion, Montgomery's responses during the interview demonstrated an understanding of the quality improvement process and of the AOC organization as a whole.  (Doc. 20-20 at 6).

After interviewing the candidates, Meeks and Lalisan, in consultation with Hicks and Dr. Devin Eckoff (Medical Director), made the decision to promote Montgomery to the QA/QI Manager position.  They based the decision on Montgomery's breadth of knowledge of AOC operations, his track record in the AOC, and his performance in the interview.  (Doc. 20-20 at 7; doc. 20-22 at 5).

Harris remembers being called in to the conference room and being told by Lalisan and Meeks that "they were keeping . . . Montgomery in that position."  (Doc. 20-4 at 20(75-76)) (emphasis added).  When Harris asked why, she recalls them saying that she "lacked management experience."  (Doc. 20-4 at 20(76)).  When asked in his deposition for the reasons why Montgomery was chosen, Meeks testified

that "it appeared that the [department] was getting caught up on their work and that things were working well and that we had impacted the change that we needed to." (Doc. 20-7 at 11(43)).

### 12. *Riley's Charge of Discrimination and Plaintiffs' Complaint.*

On or about May 5, 2011, Riley filed a charge of discrimination with the EEOC alleging he had been discriminated against on the basis of his race. The EEOC issued a Dismissal and Notice of Rights dated October 4, 2011. On February 1, 2012, Plaintiffs filed a Complaint alleging race discrimination <u>and</u> retaliation.

### 13. *No Direct Evidence*

Plaintiffs have never heard Meeks, Lalisan, or Hicks use any racially derogatory or other language suggesting they are biased against black employees. (Doc. 20-2 at 3(180)-4(185); doc. 20-5 at 8(141-142)). Plaintiffs have never heard Meeks, Lalisan, or Hicks say they should not get the QA/QI Manager position because they complained to Human Resources.

### 14. *Jobs*

Becky Smith was transferred into QA from another department and was promoted to Manager of Professional Training and Process Improvement. (Doc. 24-2 at 7). The job description for the tissue recovery manager position was also changed to require a CPTC certification, which excluded Renarkus Miller, a black employee

who had CTBS certifications.  (Doc. 24-2 at 7).  After Alan Hicks was terminated, the job description was changed back to require CTBS certification.  (Doc. 24-2 at 7; doc., 20-5 at 4(125)).

There was also a position that dealt with donor families.  The donor family position job description was changed to add a requirement for a Master's Degree in a particular field, such as social work.[34]  (Doc. 24-2 at 7).[35]

### 15.   *Montgomery's Performance In The Position*

When Montgomery initially took the manager position in November 2010, there was a backlog of approximately 160 charts.  (Doc. 20-18 at 15(60)).  Lalisan approved Hicks's decision to ship most of the backlogged charts directly to RTI, the tissue processing plant, without the donor records having gone through the required QA process.  (Doc. 20-18 at 16(63-64)); doc. 20-12 at 15(57-58)).

When asked during his deposition to rate Montgomery's performance as a manager, Riley responded: "It's hard to say.  When an individual takes a position that

---

[34]The defendant objects to this fact, stating that Harris "lacks the personal knowledge to testify regarding the drafting of job descriptions and the motives of those who develop job descriptions.  Additionally, Harris lacks any expertise or experience in drafting job descriptions." (Doc. 28 at 4).  Harris is not testifying to any motive or purpose, only that the description was changed to require the degree.  The objection is OVERRULED.

[35]The plaintiff offers the following fact: "Only one employee at the AOC had that specific degree, Carrie Peter, who is white."  (Doc. 23 at 18).  The defendant objects to this statement, saying that Harris "lacks the personal knowledge to testify regarding the education background of every AOC employee."  (Doc. 28 at 4).  The objection is SUSTAINED, as Harris has not established a foundation to testify as to this fact.

basically he's reliant on his staff to guide him through management. . . . He has to be taught quality assurance." (Doc. 20-2 at 2(179)). Likewise, Harris testified that she cannot rate Montgomery as a manager because "we all trained him to do his job, and the training is ongoing, so I am unable to rate him at this time." (Doc. 20-5 at 5(132)). Montgomery admitted to Harris that he was not as qualified for the manager position as either Harris or Riley. (Doc. 20-4 (Harris's deposition) at 17(63)).[36]

─────────────

[36]The plaintiffs proffer:

133.    On July 22, 2011, the FDA issued a  483 deficiency letter which stated as follows: Employee WM [Walt Montgomery] transferred from information technology to quality in April 2011.  Training records for both employees do not contain adequate documentation that they have been trained or educated in quality program activities.  (PX 29).

134.    Thus, the FDA recognized that Walt Montgomery did not possess the training or education, coming from the IT department, to perform the core responsibilities for his position.

(Doc. 23 at 24).  The first fact is supported by an exhibit which does not appear in the record. The second is a conclusion, not a fact.  Neither fact will be included.  The plaintiffs also proffer:

135.    According to UAHSF records, Montgomery began his training on the quality functions for the department on April 1, 2011.  (DX3, p. 132).  On September 14, 2011, Guindon trained Montgomery for the first time on the necessary steps to review an organ donor chart in order to complete the donor feedback on the UNOS system.  (DX3, pp. 134-135).

(Doc. 23 at 25) (citing 20-8 at 5(132, 134-135)).  The record citations to Meeks's deposition do not support this fact.   Meeks discusses the records at page 132, but the records have not been cited.  The plaintiffs are merely citing to counsel's recitation of Guindon's statement that the training began that date.  Similarly, the second sentence is not supported by the citation given. This fact will not be included.

The plaintiffs proffer: "136.   Montgomery does not have any relevant certifications. (DX3, p. 138)."  (Doc. 23 at 25) (citing 20-8 (Meeks's deposition) at 6(138)).  Meeks actually

At the time of his deposition, Montgomery had not been trained to perform the final chart review, which had previously been done by the QA Manager.  (Doc. 20-18 at 20(78)).

The AOC Standard Operating Procedure for quality assurance audit of donor records requires the manager to conduct "a final review of the Master Donor chart" and sign off when the chart is complete.  Harris testified that "part of the job of a QA manager . . . is to officially sign off on charts.  So, a backlog remains because [Montgomery] has never officially signed off on a chart."  (Doc. 20-5 at 8(143)).  Harris testified that, because Montgomery is unable to complete this task, "that's creating a backlog of charts that are out of compliance."  (Doc. 20-5 at 10(151)).  Riley states that this backlog is now over 1,500 charts.   (Doc. 24-1 at 12.)  Montgomery testified that the fact that he cannot perform this function is considered a "deviation" from "local policies."  (Doc. 20-18 at 20(79-79)).  Such deviations are allowed at the discretion of the director.  (Doc. 20-18 at 20(79)).[37]

---

testified that he <u>did not know</u> whether Montgomery had any certifications.  He then stated that "he does not" in response to being asked whether, <u>to his knowledge</u>, Montgomery had any certifications.  The fact will not be included.

[37]The plaintiffs proffer: "Hicks made an exception for him and allowed this deviation to continue.  (DX8, p. 79)."  (Doc. 23 at 26)(citing 20-18 (Montgomery deposition) at 20(79)).  The citation does not support the fact.  It will not be included.

The plaintiffs proffer: "144.   The backlog of charts was not the reason for the poor audit scores from the FDA, UNOS, and AOPO. (PX1, ¶36). The problems were organization-wide.

An outside consultant reviewed the tissue SOPs and made recommendations on updating them.  (Doc. 20-7 at 14(55)).The process of updating the SOPs is still ongoing, two years after Montgomery took the position. (Doc. 20-7 at 14(55)).

Since Montgomery was promoted,  the QA department has been issued three separate 483 deficiency letters from the FDA on March 24, 2011, July 22, 2011 and March 5, 2013.[38]

## V.    ANALYSIS

### A.    <u>Section 1983 Claims</u>

The plaintiffs make claims under 42 U.S.C. § 1983 in all three counts of the

---

(PX1, ¶36).”  (Doc. 23 at 26)(citing doc. 24-1 (Riley's declaration) at 11).  Riley's declaration establishes no foundation for these statements.  They will not be included.

[38]The plaintiffs proffer:

149.    Since Montgomery has been in the manager position, UNOS gave us a warning for having ongoing UNOS violations by our organ procurement personnel.  (PX1, ¶29). They recommended doing root cause analysis. (PX1, ¶29).

150.    The AOPO found all departments lacking, so they made recommendations for each department to develop processes to deal with complaints and errors before the AOC can obtain AOPO certification.  (PX1, ¶30).  Montgomery lacks the expertise to implement such a program. (PX1, ¶30).

(Doc. 23 at 26-27) (citing doc. 24-1 at 9).  As noted in the court's rulings on the motions to strike (section II. A. 2.-3.), the evidence supporting these facts will be stricken.  The facts will not be included.  Also, the plaintiffs cite a number of facts concerning an incident with Montgomery in 2007.  They do not discuss this incident in their argument.  Accordingly, these facts are not relevant and have not been included.

complaint.[39]  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed <u>by a person acting under color of state law</u>." *W. v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55, 101 L. Ed. 2d 40 (1988) (emphasis supplied).  It is undisputed that "[n]either the AOC nor UAHSF is an agent of the state of Alabama and neither operates under color of law."  (Doc. 21 at 3; doc, 23 at 4).  Further, the plaintiffs acknowledged at the hearing on this matter that they have abandoned the Section 1983 claims.  Summary Judgment is appropriate on the Section 1983 claims.

### B.      Failure to Promote Because of Race

The plaintiffs claim that the defendant violated Title VII and 42 U.S.C. § 1981 when it failed to promote them to the QA Manager position in November of 2010, and the QA/QI Manager position in January 2011.  (Doc. 23 at 28).  The court will address each position in turn.

### 1.      *The Failure to Promote to the QA Manager Position in November of 2010.*

The Eleventh Circuit has explained:

---

[39]Count One alleges race discrimination in violation of: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Count Two alleges race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Count Three alleges retaliation in violation of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

Title VII prohibits employers from discriminating against any individual with respect to the terms of employment on the basis of race or sex. 42 U.S.C. § 2000e-2(a)(1). Section 1981 also prohibits discrimination in the making and enforcing of contracts based on a person's race. 42 U.S.C. § 1981(a). . . . The same analysis applies to claims for employment discrimination brought under Title VII as to those brought under § 1981.

*Phillips v. Aaron Rents, Inc.*, 262 Fed.Appx. 202, 207 (11th Cir. 2008).

For claims based on circumstantial evidence, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.* If the plaintiff is successful, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Id.* The plaintiff then may attempt to demonstrate that the proffered reason was, in fact, merely pretext for the defendant's acts. *Id.*[9] "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

"A plaintiff establishes a *prima facie* case of discriminatory failure to promote by showing that (1) he is a member of a protected class; (2) he was qualified and applied for the promotion, (3) he was rejected despite his qualifications, and (4) other equally or less qualified employees who were not members of the protected class were promoted". *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1089 (11th Cir.2004). Under the second prong-the only one at issue here-a Title VII plaintiff need only show that he satisfied the employer's objective qualifications. *Vessels v. Atlanta Independent School System,* 408 F.3d 763, 769 (11th Cir.2005). Moreover, where an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, such as in the instant case, a plaintiff "need not show under the second prong that he applied for the position-only that the employer had some reason to consider him for the post." *Id.* at 768.

*Price v. M & H Valve Co.*, 177 F. App'x 1, 11-12 (11th Cir. 2006).

The defendant first states that the plaintiffs

> were not damaged by not receiving this position.  It was interim and
> brought no monetary or other tangible increase with it.  It was a stop gap
> measure until the new QA/QI Manager position could be created and
> filled.  Montgomery, who took on that role in addition to his existing
> duties, received no monetary increase.

(Doc. 21 at 17).  Essentially, the defendant is arguing that there was no "promotion"

at all.  Several facts, when viewed in the light most favorable to the plaintiffs, are

inconsistent with that view.

First, on November 8, 2010, Hicks and Lalisan called Riley and Guindon into

a meeting and told them that Montgomery "was being put into Joe Captain's old

position." (Doc. 20-1 at 18(66); doc. 24-1 at 6).  At a staff meeting the next day, the

move was announced as a "promotion."  When Riley first complained to Makosky,

and Harris first complained to Singer, neither Riley nor Harris were told that the

position was only interim.  Also, in December 2010, before beginning as the QA/QI

Manager, but after he was supposedly only an uncompensated "interim" manager,

Montgomery received a 5% raise.  Further, when Montgomery was named as the new

QA/QI Manager, Lalisan and Meeks told Harris that "they were keeping . . .

Montgomery in that position."  (Doc. 20-4 at 20(75-76)) (emphasis supplied).

The evidence also undercuts the defendant's argument that Montgomery

received no benefit from the position.  In addition to the evidence that Montgomery

received a raise, when asked in his deposition for the reasons why Montgomery was chosen for the new QA/QI manager position, Meeks testified that "it appeared that the [department] was getting caught up on their work and that things were working well and that we had impacted the change that we needed to." (Doc. 20-7 at 11(43)). Clearly, at least as far as Meeks was concerned, Montgomery's having been in charge of the department gave him an advantage when he was considered for the new position. A reasonable jury could infer from this evidence that the "interim" position was an actual promotion.

Next, the defendant argues that the plaintiffs cannot show that the defendant's stated reasons for giving Montgomery the position in November of 2010 were a mere pretext for discrimination. The defendant states:

> In 2010, the QA department was behind—there was a backlog of files on both the organ and tissue side. (Riley Dep., 148:7-12; Meeks Aff., ¶ 8; Montgomery Dep. 58:6-23). The AOC managers decided they needed an interim manager who would devote the time and energy needed to address the backlog (and other issues) and Montgomery had a good track record with the AOC as a hard worker who would do whatever a job required. (Lalisan Aff., ¶¶ 8, 11; Meeks Aff., ¶ 12). Additionally, they felt having someone who was not so entrenched with the current QA process, who could provide a fresh look at the problem, would be beneficial. (Lalisan Aff., ¶ 12; Meeks Aff., ¶ 12).
>
> Montgomery had been providing QA functions in other areas of the AOC (although he was not involved in hands on file review) and they felt he could bring that fresh perspective. (Lalisan Aff., ¶¶ 10, 12; Meeks Aff., ¶ 12). Finally, given that reduction of the backlog was a priority, they did not think it would have best served their goals to

remove a QA Coordinator from file review to manage the process on an interim basis. (Lalisan Aff., ¶ 13). Montgomery taking on this interim role in addition to his existing duties, seemed their best option. (Lalisan Aff., ¶ 10; Meeks Aff., ¶¶ 11-12). All of those reasons are legitimate, business judgments that have nothing to do with race.

(Doc. 21 at 17-18).  At the hearing, the defendant referred to these reasons as "staff allocation of resources," the need for a "fresh look," and that Montgomery was a "hard worker."

Once the defendant articulated these reasons the burden shifts to the plaintiff to show that each of the proffered reasons is pretextual.  As the Eleventh Circuit has noted:

> In order to show pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision .... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.,* 32 F.3d 520, 526 (11th Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In evaluating a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotations and citations omitted).

*Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

The plaintiffs' response is confusing, because it seems to combines this failure to promote claim, with the failure to promote to the new QA/QI position.  As to the "fresh look at the problem" reasoning, the plaintiffs argue that "Montgomery did not possess any of the qualifications or experience necessary to succeed as a QA Manager at the AOC. Montgomery had not worked with tissue donors before and had no direct contact with them."  (Doc. 23 at 30).  "[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S. Ct. 1195, 1197, 163 L. Ed. 2d 1053 (2006).  However, as the Eleventh Circuit has noted

> "a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the person who received the position [s]he coveted." *Springer v. Convergys Customer Mgmt. Grp.,* 509 F.3d 1344, 1349 (11th Cir.2007) (per curiam) (internal brackets & quotation marks omitted). The plaintiff "must show that the disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (internal quotation marks omitted).

*Kidd*, 731 F.3d at 1206.  Here, a reasonable jury could find that the defendant's proffered reasons were a pretext for discrimination for at least one important reason-- Captain's position, in which Montgomery was placed, <u>required</u> a bachelor's degree,

71

something Montgomery did not have, but which both plaintiffs did.  As plaintiffs' counsel noted at the hearing, a fresh look is fine, "but the eyes have to be able to see." Hiring a person who does not meet the basic qualifications of a position is evidence of pretext.

Taking the brief as a whole, and in conjunction with representations made at oral argument, the court determines that the plaintiff has rebutted the remaining reasons proffered by the defendant.  The defendant argues that it needed "an interim manager who would devote time and energy needed to address the backlog."  A reasonable jury could determine that this was a mere pretext for discrimination since Montgomery had not supervised any employees since 2000 and the additional undisputed evidence that: 1) he was not in the QA department when he was promoted to the Manager of that position; 2) he was promoted over experienced and qualified QA coordinators who had been there for years; 3) Montgomery had not worked with tissue donors before and had no direct contact with them; and 4) Montgomery admitted to Harris that he was less qualified for the position than the plaintiffs.  The hiring officials also stated that they "did not think it would have best served their goal to remove a QA Coordinator from file review to manage the process on an interim basis."  Again, a jury could determine that it is unlikely that a person who had never worked in the department, or even the field, could be an effective manager.  When all

72

of that evidence is taken together with the evidence that, contrary to UAHSF procedures, the position was not posted and opened for applications, a reasonable jury could find that the remaining preferred reasons were a mere pretext for discrimination.

"[I]n enacting Title VII Congress did not intend to transform federal courts into a "super-personnel department that reexamines an entity's business decisions." *Kidd*, 731 F. 3d at 1203. (internal quotations and citations omitted). However, in this case, the disparity in qualifications, along with the other circumstances, are enough that a reasonable person could find the defendant's preferred reasons pretextual. The failure to promote claims based on the November 2010 position will survive.

### 2.     *Failure to Promote to the New QA/QI Manager Position*

The defendant argues both that the plaintiffs were unqualified for this new position, and that they cannot show pretext. The court rejects both of these arguments.

First, a reasonable jury could determine that, once Montgomery held the position, Hicks, Lalisan, and others manipulated the job description to make sure that, when it was posted, only Montgomery would fit the description. It is undisputed that the new job description merely combined Captain's old job description (for the position which Montgomery was given in 2010) with Montgomery's old IT position

job description.   Further, Hicks, who knew that Montgomery did not have the education requirements that were in Captain's old description, removed them. Although they were later added back, a new experience substitute option was also added, with the result that Montgomery did not need to have the degree.   Finally, a management/ supervisory experience requirement (something Montgomery had and the plaintiffs did not have) was added which had not existed before.   A reasonable jury could find that these changes were made in order to preference Montgomery over the plaintiffs.   For the same reasons, a jury could determine that the defendant's proffered reason for selecting Montgomery for the new position (that he was the best candidate) is a mere pretext for discrimination.

The failure to promote claims based on the new QA/QI position will also survive.

### C.   Retaliation Based Upon Race

The plaintiffs' retaliation claim is that the defendant refused to hire them for the new QA/QI Manager position after they complained about not being given Captain's old job in November of 2010.

To establish a *prima facie* case of retaliation under Title VII, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two

74

events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). The defendant claims that it is entitled to summary judgment on Riley's claim because he did not engage in a protected expression.  In addition, the defendant argues that neither plaintiff can show a causal connection between any alleged protected activity and the denial of the promotion.

### 1.   *Riley Engaged in Protected Expression*

The defendant first argues that Riley did not engage in protected expression. The evidence, when viewed in the light most favorable to Riley, shows that, on December 9, 2010, Riley complained to Makosky that he was being discriminated against because he was not considered or allowed to interview for Captain's old position.  (Doc. 24-1 at 6).  A complaint of discrimination is protected activity.  *See, Brown v. City of Opelika*, 211 F. App'x 862, 864 (11th Cir. 2006) (failure to find *prima facie* case where no evidence of a complaint of discrimination).

### 2.   *The Plaintiffs Cannot Establish a Casual Connection Between Their Complaints of Discrimination and the Failure to Promotion Them.*

As the Eleventh Circuit has noted:

> "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta,* 212 F.3d at 590 (internal citation omitted). "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment

> discrimination, then, we must focus on the actual knowledge and actions
> of the decision-maker." *Walker v. Prudential Prop. & Cas. Ins. Co.,* 286
> F.3d 1270, 1274 (11th Cir.2002) (internal citations omitted).

*Brown*, 211 F. App'x at 863-64.  In this case, it is undisputed that Meeks and Lalisan

interviewed the candidates, consulted with Dr. Eckoff, and then made the decision to

hire Montgomery.  They each testified that, at the time that they made their decision,

although they knew the plaintiffs had complained about the November 2010 decision,

they did not know that the plaintiffs' complaints were about discrimination.   (Doc.

20-20 at 8; doc. 20-22 at 5).

In response, in a footnote, the plaintiffs cite to: a page of Hicks's deposition

which does not discuss knowledge of the complaints in any way (Doc. 23 at 32, n. 12)

(citing 20-12 at 5(20)); a page of Makosky's deposition which does not discuss

knowledge of the complaints in any way (Doc. 23 at 32, n. 12) (citing 20-16 at

13(49)); and generally to Captain's May 10, 2010 job description and performance

evaluation (Doc. 23 at 32, n. 12) (citing 25-9 at 1).

In the same footnote, they cite to a section of Singer's deposition where she

stated that Meeks and Lalisan were aware of the plaintiffs' complaints of

discrimination.  (Doc. 23 at 32, n. 12) (citing 20-14 at 36(144-145)).  However, the

context of that discussion makes it clear that Singer was most likely referring to their

knowledge at the time of a January 28, 2011, meeting with the plaintiffs. (Doc. 20-14

at 36(142)).  At best, Singer's statement, which references no date, fails to satisfy the plaintiff's burden to show Meeks's and Lalisan's knowledge <u>at the time of the decision to promote</u>.

The failure to show knowledge of the complaints on the part of the decisionmakers is fatal to the plaintiffs' case.  Summary judgment is appropriate on the retaliation claims.

## VI.    CONCLUSION

Based on the foregoing, the motions to strike will be **GRANTED in part** and **DENIED in part** as noted in Sections II and III.  The motion for Summary Judgment will be **GRANTED** as to the plaintiffs' Section 1983 and Retaliation Claims, and **DENIED** in all other respects.

**DONE** and **ORDERED** this 8th day of January, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge